**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | |
|---|---|
| AMANDA DEL TORO, DANIEL WERNER, JENNIFER MCGREGOR-HALSTEAD, JOSHUA CHROMICK, AND ALL OTHERS SIMILARLY SITUATED, <br><br> Plaintiffs, <br><br> vs. <br><br> CENTENE MANAGEMENT COMPANY, LLC, <br><br> Defendant. | Case No. 4:19-cv-02635-JAR |

**DECLARATION OF ANGELA KUROSAKA
IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR
STEP ONE NOTICE PURSUANT TO THE FAIR LABOR STANDARD ACT**

I, Angela Kurosaka, hereby declare as follows:

1.  I have personal knowledge of the facts set forth in this declaration and, if called as a witness, would competently testify thereto.

2.  I am the Senior Vice President of Medical Management for Specialized Markets for Centene Management Company, LLC ("Centene"). I have held this position since October 2015. In my current position, I oversee the case management programs and other services and operational functions provided by certain Centene managed service organizations ("MSOs").

3.  I am a registered nurse ("RN"), and hold multiple degrees, including (a) a Bachelor's degree in nursing, (b) a Masters of Nursing degree, with a focus in case management, and (c) a Doctor of Nursing Practice degree. In addition, I am a Certified Case Manager and a Certified Nephrology Nurse, and I possess a Nurse Executive Advanced Board certification.

4. I joined Centene in January 2012, and held the position of Vice President of Medical Management for the Magnolia Plan in the State of Mississippi. I held that position until approximately June 2013, when I left Centene to work elsewhere. One year later, in June 2014, I rejoined Centene as the Senior Vice President of Medical Management for the Sunflower Health Plan in the State of Kansas. Subsequently, in October 2015, I became the Senior Vice President of Medical Management for Health Systems Group (now known as Specialized Markets). After transferring to that position in 2015, I was responsible for the rollout of Centene's MSO in the State of New York, which was known as Envolve New York ("Envolve NY"). Unlike other states, where a Centene Corporation subsidiary directly contracts with the state to develop, implement and administer a managed care health plan (e.g., a Medicaid plan), in the State of New York, Envolve NY acted as a third-party MSO to perform case management and other services for a Blue Cross Blue Shield entity called Excellus, which had contracted with the State of New York to provide a managed care health plan and related services.

5. Envolve NY operated under its MSO contract with Excellus in the State of New York from April 1, 2016 through September 30, 2018. I was responsible for developing, implementing and managing/overseeing the Envolve NY case management program and other services provided to Excellus during this two and a half year time period. On September 20, 2017, Excellus notified Envolve NY that it would be ramping down its contract with Envolve NY and transitioning the case management and other services previously performed by Envolve NY to an in-house team at Excellus. That process took approximately one year, after which Envolve NY ceased operations on September 30, 2018.

6. As noted above, Envolve NY's MSO contract with Excellus required Envolve NY to provide, among other things, case management services for members of the New York managed

care health plan being run by Blue Cross Blue Shield. Case management means working with cohorts of members under a plan to perform a comprehensive assessment of each member's health status and condition, and then formulate and implement an appropriate plan of care that is customized to the member's individual medical condition and needs and designed to allow the member to achieve an optimal health outcome. The case management process requires highly-individualized assessments to determine what an "optimal health outcome" means for each particular member based on that member's unique medical history, health condition, educational and socioeconomic status, living conditions, and accessibility to resources and support. Case management also requires regular follow up with assigned members to assess and evaluate their current medical status and health conditions, and determine what steps need to be taken to address those conditions (which can include calling 911 to address immediate life-threatening circumstances, working with the member to schedule necessary follow-up medical appointments with appropriate health care providers, and revising the member's care plan to address changes in the member's health condition and/or medical needs).

7. I have read and reviewed the statements contained in the declarations submitted by opt-in plaintiffs Daniel Werner ("Werner") and Jennifer McGregor-Halstead ("McGregor-Halstead") in support of the Plaintiffs' Motion for Step One Notice Pursuant to the Fair Labor Standards Act. As stated in their declarations, Werner and McGregor-Halstead both worked as case managers for Envolve NY in 2016. Werner and McGregor-Halstead's declarations attempt to minimize the complexity and importance of their job duties as professional case managers, and assert that they "did not exercise discretion and judgment in the performance of [their] job duties" and that Centene's "guidelines were comprehensive and detailed a course of action for nearly every contingency I encountered in performing my duties." *See* Werner and McGregor-Halstead

3

declarations, at ¶ 5. These statements convey the impression that as Centene case managers, Werner and McGregor-Halstead were merely following established guidelines and using "computer software" and automated "decision-making tools" to perform the complex job of case management. I strongly disagree with these statements for several reasons.

8. First, the job being described in this section of their declarations (Paragraph 5) is not even the case manager position. Instead, the job Werner and McGregor-Halstead are discussing in that portion of their declarations is utilization review, which involves the determination of whether services or benefits requested by a member are "medically necessary." Such medical necessity determinations are completely different from case management, and do not involve performing comprehensive health assessments, developing and implementing member care plans, and following up with individual members to monitor and evaluate their health condition and determine appropriate next steps and care plan modifications to achieve optimal health outcomes for the member. These two different job positions—utilization review nurse and case manager—are apples and oranges. The utilization review position has nothing to do with the case management position and duties performed by Werner and McGregor-Halstead.

9. Second, based on my background and experience working for Envolve NY during the time period when Werner and McGregor-Halstead were employed as case managers, and my personal knowledge of the day-to-day job duties of case managers who worked for Envolve NY during that time period, I can state unequivocally that the case managers who worked for Envolve NY did much more than the "ministerial tasks" described in Paragraph 2 of the Werner and McGregor-Halstead declarations. To put it plainly, Envolve NY case managers directly affected the health and wellness of their assigned members by using their specialized medical knowledge (which they learned and acquired during their schooling to become registered nurses ("RNs")),

and their own clinical judgment and critical thinking, to (a) conduct a comprehensive assessment of each member's health status and condition, (b) develop and implement an individual care plan tailored to each member's particular medical condition and needs, and then (c) continue to work with and monitor each member to execute the care plan, make adjustments as necessary, and assist the member in managing their medical care to achieve an optimal health outcome.  There is no pre-established guideline, questionnaire, computer program or software package that can do the job of case manager.  Instead, case management requires real people who possess the medical knowledge, clinical judgment and critical thinking necessary to do the job—namely, registered nurses who have the education, training, judgment and ability to interview and assess individual members, understand the complex medical issues and conditions that affect those members (and the interrelationship between multiple health conditions (comorbidity), body systems and medications), and then develop, implement and follow/adjust a customized plan to manage that member's care in order to achieve optimal health.

10.     Envolve NY case managers who worked on cases involving physical health conditions (e.g., heart disease, diabetes, cancer, hypertension, sickle cell anemia, transplants, etc.) were required, at a minimum, to have an RN degree.  Envolve NY case managers who worked on cases involving social determinants of health or mental health issues were required to have a minimum of a bachelor's degree in an appropriate field of study such as social work or psychology.

11.     As explained above, the duties of case managers who worked for Envolve NY involved performing a comprehensive health assessment of each assigned member to determine the member's current health status and the nature and severity of any diseases or other medical conditions affecting the member; developing a care plan that prioritized and addressed all of the different components of medical treatment and care needed by the member; determining the most

5

effective means of educating the member on their medical condition and treatment, and working with them to develop effective strategies for ensuring that they implement and follow their individual care plan; and following up with the member to analyze and assess their current health status and any changes in their medical condition, and determine appropriate next steps (including any necessary emergency/urgent care, follow-up medical appointments with specific medical providers, and modifications to the member's care plan).  Although Envolve NY case managers did not provide direct medical treatment to members (e.g., by working in a hospital and providing bedside care), they directly affected and improved the health and wellbeing of the members by utilizing their specialized medical knowledge, clinical judgment and critical thinking to assess, plan and manage each member's particular medical care and needs.  In essence, case managers are the "quarterbacks" who develop, implement and oversee each member's individualized plan for achieving optimal health.

12. All case managers who worked for Envolve NY were required to use their specialized medical knowledge, and exercise clinical judgment and critical thinking, in performing their case management functions.  As an example, complex case managers who worked for Envolve NY were required to assess complex medical issues and make important decisions about critical healthcare management and planning issues on a daily basis.

13. Complex Case Management is a high level of care management services for members with complex, high-cost medical needs, such as cancer, heart disease, diabetes, hypertension, catastrophic injuries, organ transplants, respiratory conditions, post-surgical trauma, and other complex medical conditions (including "comorbidity" cases where multiple medical conditions are present).

14. Because complex case managers work with members who have complicated, high-acuity medical conditions, the case managers must possess specialized medical knowledge to understand and accurately assess the members' medical condition, and must use their own clinical judgment and critical thinking to make independent decisions about what medical care is necessary and appropriate to include in each member's individual care plan, how such care should be prioritized and sequenced, what steps are necessary to connect each member to the appropriate health care providers, and when, where and how to follow up with each member to ensure that they are executing their care plan and whether there have been any changes in the member's condition or circumstances that require immediate/additional treatment or modifications to the care plan.  Without an RN degree, and the ability to exercise clinical judgment and critical thinking, a complex case manager simply could not do their job.

15. The initial case assessment can be performed any place where the member is comfortable.  The assessment can take place either in person or via telephone; however, there are instances in which it is best to conduct the assessment in person so that the case manager can visually observe the member to best assess their needs.

16. In performing the initial case assessment, case managers utilize a computerized tool called the Comprehensive Health Assessment.  This tool provides case managers with a set of initial "baseline" questions that can be asked of members to begin the process of assessing their current health status. However, these questions are just the starting point.  As the case manager interviews the member, and learns individual details about the member's medical status and current/past health conditions and experiences, the case manager is required to use his or her specialized medical knowledge and clinical judgment to probe and understand the member's health condition, and ask whatever questions the case manager determines are necessary to develop a full

7

picture and understanding of the member's current health status.  For example, case managers are trained to present assessment questions conversationally, which frequently triggers "off-script" comments by the member that only a licensed and trained RN would recognize as being significant to the assessment of the member's health condition.  As an example, if a member has been diagnosed with a heart condition that requires a transplant, the Comprehensive Health Assessment tool will prompt the case manager to ask the member questions about their heart condition.  During this conversation, the member may make comments or provide information about matters not covered by the baseline questions—for example, the member might tell the case manager "I remember that when I was a kid in elementary school I had a rash that made my mom keep me out of school." There is nothing in the computerized health assessment tool that addresses these types of situations and instructs case managers what to do with such comments and information from members. Instead, it is up to the individual case manager, using their RN degree and specialized medical knowledge, to recognize that this member may have had rheumatic fever as a child, which could be a significant contributing factor to the member's heart disease and an important consideration in assessing the member's health condition. Neither the computer, nor a case manager without an RN degree, could do that.

17.     Case managers are required to document all relevant "off-script" comments and information received from members during the initial assessment in detailed notes that the case managers include in the members' case files.  The case manager then uses all of the information provided by the member—whether through responses to baseline questions, responses to follow-up or other questions posed by the case manager based on their own medical knowledge and judgment, or spontaneous "off-script" comments or observations from the member—to prepare a comprehensive assessment of the member's health status and condition.  It is the case manager,

using his or her medical knowledge, experience and judgment, that formulates this assessment—not any computer program or tool.

18.     Once the case assessment is complete, the case manager creates a report. This report forms the basis of the member's care plan, which consists of medical care recommendations and goals for the member, along with interventions for the member to follow in order to meet those goals. While the system may offer suggestions on potential interventions, a case manager is not required to impose the offered interventions and must decide, based on his or her specialized medical knowledge, what interventions are appropriate for a particular member based on their specific health status and medical conditions. The case manager works with the member to create the care plan and educate the member on the proposed interventions.

19.     Identifying and implementing interventions is a responsibility that requires professional medical knowledge and nursing skills. For example, to reduce the possibility that a member with certain health conditions will require additional hospitalizations, a case manager may include interventions in a care plan that require the member to restrict fluid intake, record their weight and blood pressure with a prescribed frequency, and watch for specific symptoms or conditions. A case manager must have specialized medical knowledge to be able to identify interventions that are appropriate to each individual member's condition, because some interventions will not be effective with a particular health condition or with a particular prescription medication. A case manager must be able to understand and exercise appropriate clinical judgment regarding how the member's bodily systems will interact with proposed interventions in light of the member's condition, any comorbidities, and current medications. An individual who is not a registered nurse does not possess the specialized knowledge necessary to

9

understand such interactions and identify the appropriate interventions that should be included in a member's care plan.

20. Once the care plan is in place, the case manager is responsible for determining the frequency and scope/content of follow-ups with the member. The follow-up process requires the case manager to exercise independent judgment, professional knowledge, and clinical skill. For example, if a member with heart disease who is in need of a transplant informs the case manager during a follow-up that he or she has been following the care plan but the member's metrics (e.g., blood pressure or weight) are not improving, or the member has been experiencing other symptoms or conditions (e.g., shortness of breath, difficulty standing, trouble putting on shoes in the morning due to swollen feet, etc.), the case manager is responsible for recognizing and understanding the medical significance of such information, and then determining whether and how to modify the member's care plan or take other appropriate steps. There is no dictated course of action presented to the case manager, whether through computer programs or tools, written guidelines, or company policies. Instead, it is the case manager, alone, who is responsible for making a decision on what interventions must be modified, added, or removed, and how.

21. A member's care plan is constantly updated and evaluated. Care plan modifications are completely dependent on the clinical judgment of the case manager and his or her understanding of the situation based on the information provided by that particular member. There is no computer program that recommends updates to care plans. Any new piece of information requires the case manager to have the requisite specialized medical knowledge to identify whether that information is relevant and, if so, to formulate and ask appropriate follow-up questions in order to determine any modifications to care plan and applicable interventions. Knowing what information is relevant and what or how many follow-up questions to ask is completely dependent

on the case manager's medical knowledge and ability to exercise independent clinical judgment and critical thinking to make those decisions.

22. Through their declarations, plaintiffs Werner and MacGregor-Halstead are essentially claiming that they did not perform the professional case manager job they were hired, paid and expected to do when they worked for Envolve NY. Contrary to the duties and requirements of the case manager position at Envolve NY, Werner and MacGregor-Halstead are claiming that they did **_not_** use specialized medical knowledge, did **_not_** exercise clinical judgment, and did **_not_** engage in critical thinking when they assessed, planned and managed their members' medical conditions and healthcare. The only way to test such a claim —that they were not doing their job—would be to examine their individual day-to-day work activities. Such a review cannot be done through the identical, generic declarations submitted by Werner and McGregor-Halstead, because those statements include no specific details about what they actually did in performing their job and managing the day-to-day care of their assigned members.

23. To ensure that Envolve NY case managers worked at the "top of their license," Envolve NY's case management program included other lower level non-exempt positions that handled routine administrative tasks. For example, Program Coordinators (a non-exempt position) were responsible for assisting and supporting case managers through member intake/screening, assisting members with transportation and other appointment needs, and other administrative support services. This maximized the amount of time that case managers spent on professional, exempt activities such as the use of specialized medical knowledge to assess member's health conditions, the exercise of clinical judgment to prioritize and sequence interventions and develop member care plans, and the use of critical thinking to evaluate follow-up information from members and determine appropriate next steps and care plan modifications.

11

24. In addition to Program Coordinators, Envolve NY also used Program Specialists to support its case management program. Program Specialists typically consisted of individuals educated and trained in social work, whose primary responsibilities involved identifying and improving the social determinants of a member's health, such as access to food, shelter, medications, employment, and mental health resources. Typically, these individuals possessed a bachelor's or master's degree in social work, psychology or a related social science field.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed at Linthicum Heights (city), Maryland, this 19 day of February, 2020.

_Angela Kurosaka_
Angela Kurosaka
Vice President of Medical Management
Specialized Markets

4838-4152-6196.3 095402.1005