# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | |
|---|---|
| AMANDA DEL TORO, DANIEL WERNER, JENNIFER MCGREGOR-HALSTEAD, JOSHUA CHROMICK, AND ALL OTHERS SIMILARLY SITUATED, <br><br> Plaintiffs, <br><br> vs. <br><br> CENTENE MANAGEMENT COMPANY, LLC, <br><br> Defendant. | Case No. 4:19-cv-02635-JAR |

## DECLARATION OF SHARON BENNATTS
## IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR STEP ONE NOTICE PURSUANT TO THE FAIR LABOR STANDARD ACT

I, Sharon Bennatts, hereby declare as follows:

1. I have personal knowledge of the facts set forth in this declaration and, if called as a witness, would competently testify thereto.

2. I am a Senior Manager of Case Management for the Coordinated Care of Washington ("CCW") managed care health plan in the State of Washington ("Washington Plan" or "CCW Plan"). I have held this position since 2018. In my current position, I am responsible for overseeing the CCW case management program, and for managing and providing guidance to the management team that supervises the individual case managers who work with members of the CCW Plan.

3. I am a registered nurse ("RN"), a Certified Case Manager, and a Certified Counselor.

4. I have been employed by Centene in the State of Washington since 2013, when the CCW managed care health plan first rolled out and began operations. When I began my employment with Centene in 2013, I worked as a case manager. Case managers are medical professionals who directly impact the health and wellbeing of individual plan members by assessing, planning and managing their health status/conditions and medical care. A registered nurse, social worker or licensed behavioral health professional who works as a case manager and manages a member's healthcare over a period of months or even years is just as important, and has just as much impact on achieving optimal health outcomes for members, as a nurse who provides direct bedside care to a patient in a hospital. Case management *is* healthcare, and the work performed by case managers saves and changes lives and improves the health outcomes of individual members.

5. When I worked as a case manager for CCW beginning in 2013, I conducted comprehensive health assessments of CCW members, prepared care plans for CCW members that were tailored to each member's individual health conditions and needs, monitored and managed the care of CCW members to target and achieve optimal health outcomes, and followed up with members to update their health status and medical condition(s) and determine whether additional steps (such as scheduling emergency or other follow-up care with appropriate health care providers) or care plan modifications were necessary. In performing my day-to-day work as a CCW case manager, I regularly utilized the specialized medical knowledge I learned while attending school to obtain my RN degree, exercised my own clinical judgment in assessing member health conditions and developing member care plans, and used critical analysis and thinking in managing each member's individual care and determining appropriate next steps and care plan modifications based on follow-up member interviews and review of member medical

records and information.  Without my RN degree, and my clinical experience as a nurse, I could not have performed my job as a case manager for CCW.  The case manager job involves far more than simply doing administrative, data entry or recordkeeping tasks.  It requires an understanding of (a) the full range of diseases, symptoms and medical conditions that any member may be experiencing, (b) the different systems in the body and how they relate and interact, (c) medical treatments and medications, (d) how to prioritize and sequence different medical conditions and treatments, (e) how to appropriately plan and manage a member's short/mid/long-term care, (f) how to address urgent, unexpected healthcare situations and needs that may arise for a particular member, (g) how to engage and communicate with individual members to learn and understand their complete health status and medical conditions, and (g) how to work with individual members to successfully develop and implement a care plan that is customized to their individual health circumstances and designed to allow them to achieve optimal health outcomes.

6.      After starting as a case manager for CCW in 2013, in 2014 I became a first-line manager for approximately 12-17 CCW case managers, and I held this position until I began my current role in 2018.  In performing this position, I personally worked with the case managers I was managing, assisted them with all of the complex case manager job duties described above, and supported them to ensure that they were working at the "top of their license" and performing the work of professional case managers.

7.      One unique aspect of the Washington Plan is that it covers all case management for the State of Washington foster care program.  Thus, the number of foster care cases managed by CCW case managers for the Washington Plan is much higher than plans in other states.  As a result, the Washington Plan includes case managers who are exclusively dedicated to foster care members and their complex needs.

8.     I have read and reviewed the "Factual Background" section of the brief filed by the Plaintiffs in this case in support of their Motion for Step-One Notice Pursuant to the Fair Labor Standard Act. I disagree with the plaintiffs' statement that "CMC engaged in a practice which is pervasive in the managed care industry—assigning numerous arbitrary job titles to individuals that perform substantially similar work." Doc. 36, at p. 2. The job titles assigned to CCW employees are not arbitrary. To the contrary, the different job positions assigned to the members of the CCW case management team involve different job duties, job focuses and levels of responsibility, and require different professional education, licensure, training and experience. For example, Behavioral Case Managers are responsible for conducting assessments for members with behavioral health conditions, which can include impression assessments, suicide assessments, and assessments regarding activities of daily living. In contrast, Care Manager RNs are responsible for conducting comprehensive physical health assessments of members, which involve identifying and assessing diagnosed and undiagnosed medical conditions like cancer, diabetes, cardiovascular disease, hypertension and numerous other diseases, symptoms and health conditions. Care Manager RNs are required to perform such physical health assessments of members because they have the education and specialized medical knowledge necessary to understand and assess each member's health status, medical conditions and needs, and medications. Further, under state nursing practice act requirements, only RNs may independently assess a member's health status and conditions, and develop an individual care plan to manage the member's healthcare. Lower licensure levels (e.g., licensed practical nurses (LPNs)) and non-RNs are not allowed to independently assess members with physical health conditions or develop care plans for such members.

4

9.      I have read and reviewed the statements contained in the declaration submitted by Opt-in Plaintiff Jacoba Messmann (who worked for CCW in Washington) in support of the Plaintiffs' Motion for Step One Notice Pursuant to the Fair Labor Standards Act.  As stated in her declaration, Messmann worked for the Washington Plan in a "Clinical and Nursing" capacity as a care manager.  Messmann's declaration attempts to minimize the complexity and importance of the duties of case managers and states that she "did not exercise discretion and judgment in the performance of [her] job duties" and that Centene's "guidelines were comprehensive and detailed a course of action for nearly every contingency I encountered in performing my duties."  *See* Messmann declaration, at ¶ 5 (Doc. 36-3, at pp. 22-24).  These statements convey the impression that Centene care and case managers merely follow established guidelines and use "computer software" and automated "decision-making tools" to perform the complex job of case management.  I not only strongly disagree with these statements for several reasons, but as an experienced professional case manager myself, I was personally offended when I read these statements.  As noted above, CCW case managers save and change people's lives every single day.  Case managers are medical professionals—not glorified administrative assistants.

10.     As an initial matter, the job being described in Paragraph 5 of Messmann's declaration is not a Care Manager RN position.  Instead, the job Messmann is discussing in that portion of her declaration is utilization review, which involves the determination of whether services or benefits requested by a member are "medically necessary."  Such medical necessity determinations are completely different from the case management duties performed by Care Manager RNs, and do not involve performing comprehensive health assessments, developing and implementing member care plans, and following up with individual members to monitor and evaluate their health condition and determine appropriate next steps and care plan modifications

to achieve optimal health outcomes for the member. These two different job positions—utilization review nurse and case manager—are apples and oranges. The utilization review position has nothing to do with the case management position and duties performed by Messmann.

11.     Similarly, the job being described in Paragraph 8 of Messmann's declaration is not the job of a case manager either. Case managers are not responsible for providing "direct clinical care, engag[ing] in bedside nursing, or exercise[ing] clinical judgment *to diagnose or provide medical care*." (emphasis added). Case managers do not diagnose members or provide direct (e.g., bedside) medical treatment to members. However, the fact that a case manager does not provide direct medical treatment to members or work in a hospital setting does ***not*** mean the case manager is not involved in healthcare and is not required to have and utilize specialized medical knowledge, clinical judgment and critical analysis and thinking. On the contrary, case managers directly affect and improve the health and wellbeing of their assigned members by utilizing their specialized medical knowledge, clinical judgment and critical thinking to assess, plan and manage each member's particular medical care and needs. In essence, case managers are the "conductors" who develop, implement and oversee each member's individualized plan for achieving optimal health. While they may not be "playing an instrument," they are responsible for managing and conducting the entirety of the member's healthcare "symphony." A case manager is essentially the person who is responsible for looking at members from an integrated healthcare perspective, putting together and understanding the member's whole health picture, and developing a care plan and follow-up protocol to achieve the best health outcomes for that member. As explained in more detail below, a Care Manager RN utilizes his or her specialized medical knowledge, professional education, and clinical judgment and skills at each and every stage of the case management process.

12. Based on my personal knowledge and experience working as a Washington Plan case manager and as the manager of other CCW case managers, I can state unequivocally that the case managers who worked for the Washington Plan did much more than the "ministerial tasks" described in Paragraph 2 of Messmann's declaration. The statements in the declaration paint the picture that care managers simply conduct screenings and collect data. This characterization is inaccurate. Washington Plan case managers directly affect the health and wellness of their assigned members by using their specialized medical knowledge (which they learned and acquired during their schooling to become RNs), and their own clinical judgment and critical thinking, to (a) conduct a comprehensive assessment of each member's health status and condition, (b) develop and implement an individual care plan tailored to each member's particular medical condition and needs, and then (c) continue to work with and monitor each member to execute the care plan, make adjustments as necessary, and assist the member in managing their medical care to achieve an optimal health outcome. There is no pre-established guideline, questionnaire, computer program or software package that can do the job of a case manager. Instead, case management requires real people who possess the medical knowledge, clinical judgment and critical thinking necessary to do the job—namely, registered nurses who have the education, training, judgment and ability to interview and assess individual members, understand the complex medical issues and conditions that affect those members (and the interrelationship between multiple health conditions (comorbidity), body systems and medications), and then develop, implement and follow/adjust a customized plan to manage that member's individual care in order to achieve a positive health outcome.

13. Each phase of the case management process requires the use of specialized medical knowledge, clinical judgment and skills, and critical analysis and thinking, on a daily basis. In

performing the initial case assessment, case managers utilize a computerized tool called the Comprehensive Health Assessment. This tool simply provides case managers with a set of initial "baseline" questions that can be asked of members to begin the process of assessing their current health status. However, these questions are just the starting point. As the case manager interviews the member, and learns individual details about the member's medical status and current/past health conditions and experiences, the case manager is required to use his or her specialized medical knowledge and clinical judgment to probe and understand the member's specific health condition(s), and ask whatever questions the case manager determines are appropriate and necessary to develop a full picture and understanding of the member's current health status. For example, if a member states that he or she has trouble climbing up stairs and is out of breath, or has difficulty putting shoes on in the morning when they get out of bed because of swollen feet, a registered nurse has the requisite medical and professional knowledge to know that they need to ask the member certain follow-up questions related to cardiovascular health. Neither a computer, nor a case manager without an RN degree, could do that.

14. Case managers are required to document all relevant "off-script" comments and information received from members during the initial assessment in detailed notes that the case managers include in the members' case files. The case manager then uses all of the information provided by the member—whether through responses to baseline questions, responses to follow-up or other questions posed by the case manager based on their own medical knowledge and judgment, or spontaneous "off-script" comments or observations from the member—to prepare a comprehensive assessment of the member's health status and condition. It is the case manager, using his or her medical knowledge, experience and judgment, that formulates and prepares this assessment—not any computer program or tool.

15. Next, once the case assessment is complete, the case manager creates a report and develops a care plan. The report forms the basis of the member's care plan, which consists of a comprehensive medical care "blueprint" that prioritizes and covers all of the member's medical conditions and treatment, provides specific steps and goals for the member, and details specific "interventions" for the member to follow (e.g., restrictions on fluid intake, etc.) in order to meet those goals. The case manager works with the member to create the care plan and educate the member on the proposed interventions. The care plan and proposed interventions are not automatically generated by a computer, but instead are developed by the case manager through the application of their own professional knowledge and independent judgment.

16. Identifying and implementing interventions is a responsibility that requires professional medical knowledge and nursing skills. A case manager must have specialized medical knowledge to be able to identify interventions that are appropriate to each individual member's condition, because some interventions will not be effective with a particular health condition or with a particular prescription medication. A case manager must be able to understand and exercise appropriate clinical judgment regarding how the member's bodily systems will interact with proposed interventions in light of the member's condition, any comorbidities, and current medications. An individual who is not a registered nurse does not possess the specialized medical knowledge necessary to understand such interactions and identify the appropriate interventions that should be included in a member's care plan.

17. Once the care plan is in place, the case manager is responsible for determining the frequency and scope/content of follow-ups with the member. A member's care plan is constantly updated and evaluated. Care plan modifications are completely dependent on the clinical judgment of the case manager and his or her understanding of the situation based on the information provided

by that particular member. There is no computer program that recommends updates to care plans. Any new piece of information requires the case manager to have the requisite specialized medical knowledge to identify whether that information is relevant and, if so, to formulate and ask appropriate follow-up questions in order to determine any modifications to care plan and applicable interventions. For example, a case manager must recognize when information warrants a call to 911 to address life-threatening circumstances versus scheduling an appointment with a primary care provider or other appropriate healthcare provider. A case manager must recognize when it is appropriate to modify a member's care plan when the current interventions are not providing positive results for the member. Knowing what information is relevant and which and how many follow-up questions to ask is completely dependent on the case manager's medical knowledge and ability to exercise independent clinical judgment and critical thinking to make those decisions.

18.   Another aspect of the Washington Plan which confirms that case managers are required and expected to independently utilize specialized medical knowledge, clinical judgment, and critical analysis and thinking in performing their job is the case management audit process. The Washington Plan audits each individual case manager on a quarterly basis to ensure that they are performing the duties required of professional case managers and working at the "top of their license." This quarterly audit consists of a review of two actual member cases assigned to the case manager for the quarter in question, and involves reviewing whether the case manager properly assessed the selected members' complete health status and condition, developed an appropriate care plan using their specialized medical knowledge and clinical judgment, and properly analyzed and understood follow-up information received from the member and identified any necessary care plan modifications or additional medical treatment recommendations. The focus of the audit is

not on determining whether case managers are good at "checking boxes" on a computer screen or doing administrative or data entry tasks; rather, the purpose of the audit is to ensure that case managers are properly managing the healthcare of individual members to achieve the best health outcomes for those members.  The audit reviews and determines a particular case manager's ability to make proper healthcare assessments, treatment recommendations, healthcare provider referrals, and judgments about the acuity and urgency of a member's condition.  The audit examines how the case manager investigated, assessed, developed and implemented each member's individual healthcare plan, what conclusions he or she drew from the information they received, and whether the case manager connected the member to appropriate healthcare providers and resources for their condition.  For example, the audits can identify indicators of particular conditions, such as depression or substance abuse, and then examine whether the case manager appropriately assessed for that condition, and whether the case manager appropriately prioritized any concurrent conditions or comorbidities.  In the event the audit reveals that a case manager did not use their specialized medical knowledge and exercise appropriate clinical judgment and critical analysis/thinking, the audit then is expanded to a sample of five member cases.   An audit is completely individual to each case manager.  There is no "collective" audit system that can be used to audit all case managers across the board through a single, "one size fits all" approach.  What is true for one case manager is specific to that case manager, and does not tell the auditors anything about how any other case manager is performing their job.  This underscores the fact-specific nature of the case manager job, which depends on the individual circumstances of each case manager's assigned members, and the particular products and member populations they work with.

19. In her declaration, Messmann claims she did not use specialized medical knowledge, did not exercise clinical judgment, and did not engage in critical thinking when she assessed, planned and managed her members' healthcare. As demonstrated by the Washington Plan's audit process, the only way to test such a claim—that Messmann was not doing her job—would be to examine her individual day-to-day work activities. Such a review cannot be done through the identical, general declaration submitted by Messmann, because her statements include no specific details about what she actually did in performing her job and managing the day-to-day care of her assigned members.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed at Tacoma, Washington, this 19 day of February, 2020.

*Sharon Bennatts*
Sharon Bennatts
Manager, Case Management
Coordinated Care Washington

4812-7285-3684.2 095402.1005